44 U.S. 151 (1845)
3 How. 151
WILLIAM SEARIGHT, COMMISSIONER AND SUPERINTENDENT OF THE CUMBERLAND ROAD, WITHIN THE STATE OF PENNSYLVANIA, PLAINTIFF IN ERROR,
v.
WILLIAM B. STOKES AND LUCIUS W. STOCKTON, WHO HAVE SURVIVED RICHARD C. STOCKTON, DEFENDANTS IN ERROR.
Supreme Court of United States.

*156 Veech and Walker, for the plaintiff in error.
Coxe and Nelson, attorney-general, for the defendants in error.
*162 Mr. Chief Justice TANEY delivered the opinion of the court.
The question in this case is, whether the state of Pennsylvania can lawfully impose a toll on carriages employed in transporting the mail of the United States over that part of the Cumberland road which passes through the territory of that state?
*163 The dispute has arisen from an act of the legislature of Pennsylvania, passed in 1836, whereby wagons, carriages, stages, and other modes of conveyance, carrying the United States mail, with passengers or the goods of other persons, are charged with half the toll levied upon other vehicles of the like description. The plaintiff in error is the commissioner and superintendent of the road, appointed by the state. The defendants are contractors for carrying the mail, and they insist that their carriages, when engaged in this service, are entitled to pass along the road free from toll, although they are conveying passengers and their baggage at the same time. In order to obtain the opinion of this court upon the subject, an amicable action was instituted by the plaintiff in the Circuit Court of the United States for the western district of Pennsylvania, for the tolls directed to be collected by the law above mentioned, and the facts in the case stated by consent. The judgment of the Circuit Court was against the plaintiff, and it is now brought here for revision by writ of error.
The Cumberland road has been so often the subject of public discussion, and the circumstances under which it was constructed and afterwards surrendered to the several states through which it passes, are so generally known, that we shall forbear to state them further than may be necessary for the purpose of showing the character of the present controversy, and explaining the principles upon which the opinion of this court is founded.
The road in question is the principal line of communication between the seat of government and the great valley of the Mississippi. It passes through Maryland, Pennsylvania, Virginia, and Ohio, and was constructed at an immense expense by the United States, under the authority of different and successive acts of Congress: the states contributing nothing either to the making of the road or to the purchase of land over which it passes. They did nothing more than enact laws authorizing the United States to construct the road within their respective limits, and to obtain the land necessary for that purpose from the individual proprietors upon the payment of its value.
After the road had thus been made  although it was constructed with the utmost care, sparing no efforts to make it durable  it was still found to be incapable of withstanding the wear and tear produced by the number of carriages continually passing over it, engaged in transporting passengers, or heavily laden with agricultural produce or merchandise; and that either a very great expense must be annually incurred in repairs, or the road, in a short time, would be entirely broken up and become unfit for use. As no permanent provision had been made for these repairs, applications were made to Congress for the necessary funds; and as these demands upon the public treasury unavoidably increased, as the road was extended or longer in use, they naturally produced a strong feeling of dissatisfaction *164 and opposition in those portions of the union which had no immediate interest in the road; and the constitutional power of Congress to make these appropriations was also earnestly, and upon many applications, contested by many of the eminent statesmen of the country. It therefore became evident, that unless some other means than appropriations from the public treasury could be devised, a work which every one felt to be a great public convenience, in which a large portion of the union was directly and deeply interested, and which had been constructed at so much cost, must soon become a total ruin.
In this condition of things, the state of Ohio, on the 4th of February, 1831, passed an act, proposing, with the assent of Congress, to take under its care immediately the portion of the road within its limits which was then finished, and the residue from time to time as different parts of it should be completed, and to erect toll gates thereon, and to apply the tolls to the repair and preservation of the road, specifying in the law the tolls it proposed to demand, and containing a proviso in relation to the property of the United States, and to persons in its service, in the following words: "That no toll shall be received or collected for the passage of any stage or coach conveying the United States mail, or horses bearing the same, or any wagon or carriage laden with the property of the United States, or any cavalry or other troops, arms, or military stores, belonging to the same, or to any of the states comprising this union, or any person or persons on duty in the military service of the United States, or of the militia of any of the states." On the 2d of March, in the same year, Congress passed a law assenting to this act of Ohio, which is recited at large in the act of Congress, with all its provisions and stipulations.
The measure proposed by the state of Ohio seems to have been received with general approbation; and on the 4th of April, 1831, Pennsylvania, about two months after the passage of the law of Ohio, passed an act similar in its principles, but varying from it in some respects on account of the different condition of the road in the two states. In Ohio it was new and unworn, and therefore needed no repair; while in Pennsylvania, where it had been in use for several years, it was in a state of great dilapidation. While proposing, therefore, to take it under the care of the state, and to charge the tolls specified in the act, it annexed a condition that the United States should first put so much of it as passed through that state in good repair, and an appropriation be also made by Congress for erecting toll-houses and toll-gates upon it. The clause in relation to the passage of the property of the United States over the road; also varies from the language of the Ohio law, and is in the following words: "That no toll shall be received or collected for the passage of any wagon or carriage laden with the property of *165 the United States, or any cannon or military stores belonging to the United States, or to any of the states composing this union."
The example of Pennsylvania was followed by Maryland and Virginia, at the next succeeding sessions of their respective legislatures: the law of Maryland being passed on the 23d of January, 1832, and the Virginia law on the 7th of February following. The proviso in relation to the property of the United States, in the Maryland act, is precisely the same with that of Pennsylvania, and would seem to have been copied from it, while the proviso in the Virginia law, upon this subject, follows almost literally the law of Ohio.
With these several acts of Assembly before them, Congress, on the 3d of July, 1832, passed a law declaring the assent of the United States to the laws of Pennsylvania and Maryland, to remain in force during the pleasure of Congress; and the sum of $150,000 was appropriated to repair the road east of the Ohio river, and to make the other needful improvements required by the laws of these two states. No mention is made of Virginia in this act of Congress, because in her law the previous reparation of the road, and the erection of toll-houses and gates, at the expense of the United States, was not in express terms made the condition upon which she accepted the surrender of the road; but the assent of Congress was afterwards given to her law by the act of March 2d, 1833, which, like the contract with the two other states, was to remain in force during the pleasure of Congress.
The sum appropriated, as above mentioned, was, however, found insufficient for the purposes for which it was intended, and by an act of June 24th, 1834, the further sum of $300,000 was appropriated; and this act states the appropriation to be made for the entire completion of the road east of the Ohio, and other needful improvements, to carry into effect the laws of Pennsylvania, Maryland, and Virginia, each of which is particularly referred to in the act of Congress; and further directs that as far as that sum is expended, or so much of it as shall be necessary, the road should be surrendered to the states respectively through which it passed. But so greatly had the road become dilapidated, that even these large sums were found inadequate to place it in a proper condition, and by the act of March 3d, 1835, the further sum of $346,188 58/100, was appropriated; but this law directed that no part of it should be paid or expended until the three states should respectively accept the surrender; and that the United States "should not thereafter be subject to any expense in relation to the said road." Under this act of Congress the surrender was accordingly accepted, in 1835, and the money applied as directed by the act of Congress, and from that time the road has been in the possession of and under the control of the several states, with toll-gates upon it. This is the history of the road, and of the legislation of Congress and the states *166 upon that subject, (so far as it is necessary now to state it,) up to the time when the road passed into the hands of the states. We shall have occasion hereafter to speak more particularly of the act of Congress last mentioned, because it is the act under which the states finally took possession of the road.
When the new arrangement first went into operation no toll was charged in any of the states upon carriages transporting the mail of the United States; and no toll upon such carriages has ever yet been claimed in Ohio, Maryland, or Virginia. But on the 13th of June, 1836, the state of Pennsylvania passed a law, declaring that carriages, &c., carrying the property of the United States or of a state, which were exempted from the payment of toll by the act of 1831, should thereafter be exempted only in proportion to the amount of property in such carriage belonging to the United States or a state, and, "that in all cases of wagons, carriages, stages, or other modes of conveyance, carrying the United States mail, with passengers or goods, such wagon, stage, or other mode of conveyance shall pay half-toll upon such modes of conveyance." And we are now to inquire whether this half-toll can be imposed upon carriages carrying the mail under the compact between the United States and Pennsylvania.
It will be seen from this statement, that the constitutional power of the general government to construct this road is not involved in the case before us; nor is this court called upon to express any opinion upon that subject; nor to inquire what were the rights of the United States in the road previous to the compacts hereinbefore mentioned. The road had in fact been made at the expense of the general government. It was the great line of connection between the seat of government and the western states and territories, affording a convenient and safe channel for the conveyance of the mails, and enabling the government thereby to communicate more promptly with its numerous officers and agents in that part of the United States west of the Alleghany mountains. The object of the compacts was to preserve the road for the purposes for which it had been made. The right of the several states to enter into these agreements will hardly be questioned by any one. A state may undoubtedly grant to an individual or a corporation a right of way through its territory upon such terms and conditions as it thinks proper; and we see no reason why it may not deal in like manner with the United States, when the latter have the power to enter into the contract. Neither do we see any just ground for questioning the power of Congress. The Constitution gives it the power to establish post-offices and post-roads; and charged, as it thus is, with the transportation of the mails, it would hardly have performed its duty to the country, if it had suffered this important line of communication to fall into utter ruin, and sought out, as it must have done, some circuitous or tardy and difficult-route, when by the immediate payment *167 of an equivalent it obtained in perpetuity the means of performing efficiently a great public duty, which the Constitution has imposed upon the general government. Large as the sum was which it paid for repairs, it was evidently a wise economy to make the expenditure. It secured this convenient and important road for its mails, where the cost of transporting them is comparatively moderate, instead of being compelled to incur a far heavier annual expense, as they must have done, if, by the destruction of this road, they had been forced upon routes more circuitous or difficult, when much higher charges must have been demanded by the contractors. Certainly, neither Ohio, nor Pennsylvania, nor Maryland, nor Virginia, appear from their laws to have doubted their own power or the power of Congress. But we do not understand, that Pennsylvania now upon any ground disputes the validity of the compact or denies her obligation to perform it; on the contrary, she asserts her readiness to fulfil it in all its parts, according to its true meaning; but denies the construction placed upon it by the United States. It is to that part of the case, therefore, that it becomes the duty of the court to turn its particular attention.
It is true, that in the law of Pennsylvania, and of Maryland also, assented to by Congress, the exemption of carriages engaged in carrying the mail is not so clearly and specifically provided for as in the laws of Ohio and Virginia. But in interpreting these contracts the character of the parties, the relation in which they stand to one another, and the objects they evidently had in view, must all be considered. And we should hardly carry out their true meaning and intention if we treated the contract as one between individuals, bargaining with each other with adverse interests, and should apply to it the same strict and technical rules of construction that are appropriate to cases of that description. This, on the contrary, is a contract between two governments deeply concerned in the welfare of each other; whose dearest interests and happiness are closely and inseparably bound up together, and where an injury to one cannot fail to be felt by the other. Pennsylvania, most undoubtedly, was anxious to give to the general government every aid and facility in its power, consistent with justice to its own citizens, and the government of the United States was actuated by a like spirit.
This was the character of the parties and the relation in which they stood. Besides, a considerable number of the citizens of the state had a direct interest in the preservation of the road; and the state had manifested its sense of the importance of the work by the act of Assembly of 1807, which authorized the construction of the road within its limits; and again in the resolution passed in 1828, by which it proposed to confer upon Congress the power of erecting gates and charging toll. Yet the only value of this road to the general government worth considering is for the transportation of the mails; and in that point of view it is far more important than *168 any other post-road in the union. Occasionally, indeed, arms or military stores may be transported over it; and sometimes a portion of the military force may pass along it. But these occasions for its use, especially in time of peace, but rarely occur; the daily and necessary use of the road by the United States is as a post-road, forming an almost indispensable link in the chain of communication from the seat of government to its western borders.
Now, as this was well known to the parties, can it be supposed that when Pennsylvania, by her act of 1831, proposed to take the road, and keep it in repair from the tolls collected upon it, and exempted from toll carriages laden with the property of the United States, she yet intended to charge it upon the mails? That in return for the large expenditure she required to be made, before she would receive the road, she confined her exemption to matters of no importance, and reserved the right to tax all that was of real value? And when Congress assented to the proposition, and incurred such heavy expenses for repairs, did they mean to leave their mails through Maryland and Pennsylvania still liable to the toll out of which the road was to be kept in repair? Upon this point the act of Congress of March 3d, 1835, is entitled to great consideration. For it was under this law that the states finally took possession of the road and proceeded to collect the tolls. By so doing they assented to all the provisions contained in this act of Congress; and one of them is an express condition, that the United States should not thereafter be subject to any expense in relation to the road. Yet under the argument, the expenses of the road are to be defrayed out of the tolls collected upon it. And if the mails in Pennsylvania and Maryland may be charged, it will be found, that instead of the entire exemption, for which the United States so expressly stipulated, and to which Pennsylvania agreed, a very large proportion of the expenses of repair will be annually thrown upon them. We do not think that either party could have intended, when the contract was made, to burden the United States in this indirect way for the cost of repairs. So far as the general government is concerned, it might as well be paid directly from the Treasury. For nobody, we suppose, will doubt that this toll, although in form it is paid by the contractors, is in fact paid by the Post-office Department. It is not a contingent expense, which may or may not be incurred, and about which a contractor may speculate; but a certain and fixed amount, for which he must provide, and which, therefore in his bid for the contract, he must add to the sum he would be otherwise willing to take. It is of no consequence to the United States whether charges for repairs are cast upon it through its Treasury or Post-office Department. In either case it is not free from expense in relation to the road, according to the compact upon which it was surrendered to and accepted by the states.
Neither do the words of the law of Pennsylvania of 1831 require *169 a different construction. The United States have unquestionably a property in the mails. They are not mere common carriers, but a government, performing a high official duty in holding and guarding its own property as well as that of its citizens committed to its care; for a very large portion of the letters and packages conveyed on this road, especially during the session of Congress, consists of communications to or from the officers of the executive department, or members of the legislature, on public service or in relation to matters of public concern. Nor can the word laden be construed to mean fully laden, for that would in effect destroy the whole value of the exemption, and compel the United States to pay a toll even on its military stores and other property, unless every wagon or carriage employed in transporting it was as heavily laden as it could conveniently bear. We think that a carriage, whenever it is carrying the mail, is laden with the property of the United States within the true meaning of the compact: and that the act of Congress of which we have spoken, and to which the state assented, must be taken in connection with the state law of 1831 in expounding this agreement. Consequently, the half-toll imposed by the act of 1836 cannot be recovered.
The acts of assembly of Ohio and Virginia have been relied on in the argument by the plaintiff in error; and it has been urged that, inasmuch as the laws of these states, in so many words, exempt carriages carrying the mail of the United States, the omission of these words in the law in question shows that Pennsylvania intended to reserve the right to charge them with toll. And it is moreover insisted that, as the law of Ohio which contains this provision passed some time before the act of Pennsylvania, it ought to be presumed that the law of the latter was drawn and passed with a full knowledge of what had been done by the former, and that the stipulation in favour of the mail was designedly and intentionally omitted, because the state of Pennsylvania meant to reserve the right to charge it.
The court think otherwise. Even if the law of Ohio is supposed to have been before the legislature of Pennsylvania, it does not by any means follow that the omission of some of its words would justify the inference urged in the argument, where the words retained, by their fair construction, convey the same meaning. Indeed, if it appeared that the Ohio law was in fact before the legislature of Pennsylvania when it framed its own act upon the subject, it would rather seem to lead to a contrary conclusion. For it cannot be supposed that in the compact which the United States was about to form with four different states, and when the agreement with one would have been of no value without the others, Pennsylvania would have desired or asked for any privileges to herself which were not extended to the other states, nor that she would be less anxious to give every facility in her power to the general *170 government when carrying out through her territory the important and necessary operations of the Post-office Department. Nor could she have supposed that Congress would give privileges to one state which were denied to others; and, after having done equal justice to all in the repair and preparation of the road wherever needed, make different contracts with the different states; and, while it bargained for the exemption of its mails in one or more of them, consent to pay toll in another. The fact that they are clearly and explicitly exempted from toll in Ohio and Virginia is a strong argument to show that it was intended to exempt them in all, and that the compacts with Pennsylvania and Maryland were understood and believed to mean the same thing, and to accomplish the same objects. And this conclusion is greatly strengthened by the fact that Maryland, where the words of the law are precisely the same with those of Pennsylvania, has never claimed the right to exact toll from carriages carrying the mail; nor did Pennsylvania claim it in the first instance, and they were always allowed to pass free until the act of 1836. Indeed that law itself appears to recognize the right of the mail and other property of the United States to go free, and the imposition of only half-toll would seem to imply that the state intended to reach other objects, and did not desire to lay the burden upon any thing that properly belonged to the United States. And so far as we can judge from its legislation, Pennsylvania has never to this day placed any other construction upon its compact than the one we have given, and has never desired to depart from it.
If we are right in this view of the subject, the error consists in the mode by which the state endeavored to attain its object. Unquestionably the exemption of carriages bearing the mail is no exemption of any other property conveyed in the same vehicle, nor of any person travelling in it, unless he is in the service of the United States, and passing along in pursuance of orders from the proper authority. Upon all other persons, although travelling in the mail-stage, and upon their baggage or any other property, although conveyed in the same carriage with the mail, the state of Pennsylvania may lawfully collect the same toll that she charges either upon passengers or similar property in other vehicles. If the state had made this road herself, and had not entered into any compact upon the subject with the United States, she might undoubtedly have erected toll-gates thereon, and if the United States afterwards adopted it as a post-road, the carriages engaged in their service in transporting the mail, or otherwise, would have been liable to pay the same charges that were imposed by the state on other vehicles of the same kind. And as any rights which the United States might be supposed to have acquired in this road have been surrendered to the state, the power of the latter is as extensive in collecting toll as if the road had been made by herself, except *171 in so far as she is restricted by her compact; and that compact does nothing more than exempt the carriages laden with the property of the United States, and the persons and baggage of those who are engaged in their service. Toll may therefore be imposed upon every thing else in any manner passing over the road; restricting, however, the application of the money collected to the repair of the road, and to the salaries and compensation of the persons employed by the state in that duty.
It has been strongly pressed in the argument, that the construction placed upon the compact by the court would enable the contractors to drive every other line of stages from the road, by dividing the mail-bags among a multitude of carriages, each of which would be entitled to pass toll free, while the rival carriages would be compelled to pay it. And that by this means the contractors for carrying the mail would in effect obtain a monopoly in the conveyance of passengers throughout the entire length of the road, greatly injurious to the public, by lessening that disposition to accommodate which competition is sure to produce, and enhancing the cost of travelling beyond the limits of a fair compensation.
The answer to this argument is, that under the agreement they have made, according to its just import, the United States cannot claim an exemption for more carriages than are necessary for the safe, speedy, and convenient conveyance of the mail. And if measures such as are suggested were adopted by the contractors, it would be a violation of the compact. The postmaster-general has unquestionably the right to designate not only the character and description of the vehicle in which the mail is to be carried, but also the number of carriages to be employed on every post-road. And it can scarcely, we think, be supposed, that any one filling that high office, and acting on behalf of the United States, would suffer the true spirit and meaning of the contract with the state to be violated or evaded by any contractor acting under the authority of his department. But undoubtedly, if such a case should ever occur, the contract, according to its true construction, could be enforced by the state in the courts of justice; and every carriage beyond the number reasonably sufficient for the safe, speedy, and convenient transportation of the mail would be liable to the toll imposed upon similar vehicles owned by other individuals. In a case where an error in the post might be so injurious to the public, it would certainly be necessary that the abuse should be clearly shown before the remedy was applied. But there can be no doubt, that the compact in question, in the case supposed, would not shield the contractor, and upon a case properly made out and established, it would be the duty of a court of justice to enforce the payment of the tolls. No such fact, however, appears or is suggested in the case before us, and the judgment of the Circuit Court is therefore affirmed.
*172 Mr. Justice McLEAN.
I dissent from the opinion of the court. And as the case involves high principles and, to some extent, the action and powers of a sovereign state, I will express my opinion.
This was an amicable action to try whether the defendants, who are contractors for the transportation of the mail on the Cumberland road, are liable, under the laws of Pennsylvania, to pay toll for stages in which the mail of the United States is conveyed.
This road was constructed by the federal government through the state of Pennsylvania, with its consent. Whether this power was thus constitutionally exercised, is an inquiry not necessarily involved in the decision of this case. The road was made, and for some years it was occasionally repaired by appropriations from the Treasury of the United States. These appropriations were made with reluctance at all times, and sometimes were defeated. This, as a permanent system of keeping the road in repair, was, of necessity, abandoned; and, with the assent of Pennsylvania, Congress passed a bill to construct toll-gates and impose a tax on those who used the road. This bill was vetoed by the President, on the ground that Congress had no constitutional power to pass it. The plan was then adopted to cede the road, on certain conditions, to the states through which it had been established.
On the 4th of April, 1831, Pennsylvania passed "An act for the preservation of the Cumberland road."
By the 1st section it was provided, that as soon as the consent of the government of the United States shall have been obtained, certain commissioners, who were named, were to be appointed, whose duties in regard to the road were specially defined. The 2d section enacted, that to keep so much of the road in repair as lies in the state of Pennsylvania, and pay the expense of collection, &c., the commissioners should cause six toll-gates to be erected, and certain rates of toll were established. To this section there was a proviso, "that no toll shall be received or collected for the passage of any wagon or carriage laden with the property of the United States, or any cannon or military stores belonging to the United States or to any of the states composing the union."
By the 4th section the tolls were to be applied, after paying expenses of collection, &c., to the repairs of the road, the commissioners having power to increase them, provided they shall not exceed the rates of toll on the Harrisburg and Pittsburgh road. The last section provided that the toll should not be altered below or above a sum necessary to defray the expenses incident to the preservation and repair of said road, &c., and also, "that no change, alteration, or amendment shall ever be adopted, that will in any wise defeat or affect the true intent and meaning of this act."
By the 10th section of the above act it was declared to have no effect until Congress should assent to the same, "and until so much *173 of the said road as passes through the state of Pennsylvania be first put in a good state of repair, and an appropriation made by Congress for erecting toll-houses and toll-gates thereon, to be expended under the authority of the commissioners appointed by this act."
By their act of the 24th of June, 1834, Congress appropriated $300,000 to repair the Cumberland road east of the Ohio river, which referred to the above act of Pennsylvania, and also to similar acts passed by Virginia and Maryland. And in the 4th section of the act it was provided, "that as soon as the sum by this act appropriated, or so much thereof as is necessary, shall be expended in the repair of said road agreeably to the provisions of this act, the same shall be surrendered to the states respectively through which said road passes; and the United States shall not thereafter be subject to any expense for repairing said road." This surrender of the road was accepted by Pennsylvania, by an act of the 1st of April, 1835.
The above acts constitute the compact between the state of Pennsylvania and the union, in regard to the surrender of this road. The nature and extent of this compact are now to be considered.
As before remarked, the constitutional power of Congress to construct this road is not necessarily involved in this decision. By the act of Congress of the 30th of April, 1802, to authorize the people of Ohio to "form a constitution and state government," among other propositions for the acceptance of the state, it was proposed that "five per cent. of the net proceeds of the lands lying within the said state, sold by Congress, should be applied to the laying out and making public roads leading from the navigable waters falling into the Atlantic, to the Ohio, to the said state, and through the same; such roads to be laid under the authority of Congress, with the consent of the several states through which the roads shall pass: provided the state shall agree not to tax land sold by the government until after the expiration of five years from the time of such sale."
By the 2d section of the act of the 3d March, 1803, three per cent. of the above fund was placed at the disposition of the state, to be "applied to the laying out, opening, and making roads, within the state."
The above conditions, having been accepted by Ohio, constituted the compact under which the Cumberland road was laid out and constructed by the authority of Congress. And of this work it may be said, however great has been the expenditure through the inexperience or unfaithfulness of public agents, that no public work has been so diffusive in its benefits to the country. It opened a new avenue of commerce between the eastern and western states. Since its completion, and while it was kept in repair, the annual transportation of goods and travel on it saved an expense equal to no inconsiderable part of the cost of the road. But its cession to the states *174 through which it was established was found necessary to raise, by tolls, an annual revenue for its repair.
Whatever expenditure was incurred in the construction of this road beyond the two per cent. reserved by the compact with Ohio, was amply repaid by the beneficial results of the work; and this was the main object of Congress. It was a munificent object, and worthy of the legislature of a great nation.
The road was surrendered to Pennsylvania and the other states through which it had been constructed. But what was ceded to Pennsylvania? All the right of the United States which was not reserved by the compact of cession. This right may be supposed to arise from the compact with Ohio; the consent of Pennsylvania to the construction of the road, and the expense of its construction, including the sums paid to individuals for the right of way. These, and whatever jurisdiction over the road, if any, might be exercised by the United States, were surrendered to Pennsylvania. The road then must be considered as much within the jurisdiction and control of Pennsylvania, excepting the rights reserved in the compact, as if it had been constructed by the funds of that state. It is, therefore, important to ascertain the extent of the rights reserved by the United States.
In the closing paragraph of the 2d section of the act of 1831, above cited, it is provided, "that no toll shall be received or collected for the passage of any wagon or carriage laden with the property of the United States, or any cannon or military stores belonging to the United States, or to any of the states composing this union." In addition to this, there were certain limitations imposed, as to the amount of tolls, on the state of Pennsylvania, which need not now be considered.
Some light may be cast on the import of the above reservation by a reference to somewhat similar compacts made in regard to the same subject between the United States and the states of Ohio, Maryland, and Virginia. The Ohio act of the 2d of March, 1831, provides, in the 4th section, "that no toll shall be received or collected for the passage of any stage or coach conveying the United States mail, or horses bearing the same, or any wagon or carriage laden with the property of the United States, or any cavalry or other troops, arms, or military stores, belonging to the same, or to any of the states comprising this union, or any person or persons on duty in the military service of the United States, or of the militia of any of the states." The 4th section of the Maryland act of the 23d of January, 1832, provided, "that no tolls shall be received or collected for the passage of any wagon or carriage laden with the property of the United States, or any cannon or military stores belonging to the United States, or to any of the states composing this union." In the Virginia act of the 7th of February, 1832, it is provided, "that no toll shall be received or collected for the passage of any *175 stage or coach conveying the United States mail, or horses bearing the same, or any wagon or carriage laden with property of the United States, or any cavalry another troops, army or military stores, belonging to the same, or to any of the states comprising this union, or any person or persons on duty in the military service of the United States, or of the militia of any of the states."
The reservations in the Pennsylvania and Maryland acts are the same, and differ materially from those contained in the acts of Ohio and Virginia. In the latter acts the mail-stage is excepted, but not in the former. Pennsylvania and Maryland exempt from toll "any wagon or carriage laden with the property of the United States;" but the same exemption is contained in the Ohio and Virginia laws in addition to that of the mail-stage. Now, can the reservations in these respective acts be construed to mean the same thing? Is there no difference between the acts of Ohio and Pennsylvania? Their language is different, and must not their meaning be sought from the words in the respective acts? They are separate and distinct compacts. The Ohio law was first enacted, and was, probably, before the legislature of Pennsylvania when their act was passed. But whether this be the fact or not, they were both sanctioned by Congress; and the question is, whether both compacts are substantially the same? That the legislatures did not mean the same thing seems to me to be clear of all doubt. Did Congress, in acceding to these acts, consider that they were of the same import? Such a presumption cannot be sustained without doing violence to the language of the respective acts.
In both acts wagons laden with the property of the United States are exempted. In the Ohio act the mail-stage is exempted from toll, but not in the act of Pennsylvania. Now, is the mail-stage exempted from toll by both acts or by neither? Is not either of these positions equally unsustainable? The exemption of the mail-stage must be struck out of the Ohio law to sustain one of these positions, and to sustain the other it must be inserted in the act of Pennsylvania. Does not the only difference consist in striking out in the one case and inserting in the other? This must be admitted unless the words, "wagon or carriage laden with the property of the United States," mean one thing in the Ohio law, and quite a different thing in the law of Pennsylvania. These words have a sensible and obvious application in both acts, without including the mail-stage. In the Ohio law the words "no toll shall be received or collected for the passage of any stage or coach conveying the United States mail," cannot, by any sound construction, be considered as surplusage; and yet they must be so considered if the Pennsylvania act exempt the mail-stage.
When one speaks of transporting the property of the United States, the meaning of the terms "property of the United States," is never mistaken. They mean munitions of war, provisions purchased *176 for the support of the army, and any other property purchased for the public revenue. They do not mean the mail of the United States. A wagon laden with property is understood to be a wagon used for the transportation of property, in the ordinary sense of such terms. A wagon or carriage being laden is understood to have a full or usual load. The mail-stage of the United States is never spoken of in this sense. It is used for the transportation of passengers as well as the mail, and in this view it is undoubtedly considered when spoken of in conversation, and especially when referred to in a legislative act. In no sense can the mail-stage be considered a "carriage laden with the property of the United States." The same exception applies to a wagon or carriage laden with the property of a state. Now no one can doubt the meaning of the exception thus applied. And can a different meaning be given to the same words when applied to the United States? Certainly not, unless the mail can be denominated the property of the United States.
The mail of the United States is not the property of the United States. What constitutes the mail? Not the leathern bag, but its contents. A stage load of mail-bags could not be called the mail. They might be denominated the property of the United States, but not the mail. The mail consists of packets of letters made up with post-bills, and directed to certain post-offices for distribution or delivery; and whether these be conveyed in a bag or out of it, they are equally the mail; but no bag without them is or can be called the mail. Can these packets be said to be the property of the United States? The letters and their contents belong to individuals. No officer in the government can abstract a letter from the mail, not directed to him, without incurring the penalty of the law. And can these letters or mailed pamphlets or newspapers be called the property of the United States? They in no sense belong to the United States, and are never so denominated. If a letter be stolen from the mail which contains a bank-note, the property in the note is laid in the person who wrote the letter in which the note is enclosed. From these views I am brought to the conclusion that neither party to the compact under consideration could have understood "a wagon or carriage laden with the property of the United States," as including the mail-stage of the United States.
Are there any considerations connected with this subject which lead to a different conclusion from that stated. The fact that four distinct compacts were entered into with four states to keep this road in repair, cannot have this effect. We must judge of the intention of the parties to the compact by their language. I know of no other rule of construction. Two of these compacts exempt the mail-stage from toll, and two of them do not exempt it. Now, if the same construction, in this respect, must be given to all of them, *177 which of the alternatives shall be adopted? Shall the mail-stage be exempted by all of them, or not exempted by any of them?
What effect can the expenditures of the United States, in the construction of this road, have upon this question? In my judgment, none whatever. The reservation must be construed by its terms, and not by looking behind it. The federal government has been amply repaid for the expenditures in the construction of this road, great and wasteful as they may have been, by the resulting benefits to the nation. It is now the road of Pennsylvania, subject only to the terms of the compact. In the act surrendering this road to the states respectively, through which it passes, Congress say, "and the United States shall not thereafter be subject to any expense for repairing said road." To get clear of this expense was the object of the cession of it to the states. But does this affect the question under consideration. The repairs of the road are provided for, by the tolls which the state of Pennsylvania is authorized to impose. And this is the meaning of the above provision. It is supposed, that the exaction of toll on the mail-stage would conflict with that provision. But how does it conflict with it? The toll on the mail-stage is not paid by the government, but by the contractor. And whether this toll will increase the price paid by the government for the transportation of the mail, is a matter that cannot be determined. Competition is invited and bids are made for this service, and the price to be paid depends upon contingent circumstances. The toll would be paid, in part, if not in whole, by a small increase of price for the transportation of passengers. The profits of the contractor might, perhaps, be somewhat lessened by the toll, or it might increase, somewhat, the cost of conveying the mail. But this is indirect and contingent; so that in no sense can it be considered as repugnant to the above provision. "The United States are not to be subject to any expense for repairing this road;" and they are not, in the sense of the law, should the Post-office Department have to pay, under the contingencies named, a part of the toll stated. Whether it does pay it or not, under future contracts, cannot be known; and whatever expense it may pay, will be for the use, and not the repair, of the road.
The act of the 13th of June, 1836, which is supposed to be in violation of the compact, I will now consider. That act provides, "That all wagons, carriages, or other modes of conveyance, passing upon that part of the Cumberland road which passes through Pennsylvania, carrying goods, cannon, or military stores belonging to the United States, or to any individual state of the union, which are excepted from the payment of toll by the second section of an act passed the 4th of April, 1831, shall extend only so far as to relieve such wagons, carriages, and other modes of conveyance, from the payment of toll to the proportional amount of such goods *178 so carried belonging to the United States, or to any of the individual states of the union; and that in all cases of wagons, carriages. stages, or other modes of conveyance, carrying the United States mail, with passengers or goods, such wagon, stage, or other mode of conveyance, shall pay half-toll upon such modes of conveyance."
By the act of 1831, "every chariot, coach, coachee, stage, wagon, phaeton, or chaise, with two horses and four wheels, were to be charged at each gate twelve cents; for either of the carriages last mentioned, with four horses, eighteen cents." Is the act of 1836, which imposes half-toll on "the mail-stage, with passengers or goods," repugnant to the above provision? I think it is not, in any respect.
If the mail be not the property of the United States, then the stage in which it is conveyed is not within the exception of the act of 1831, and it is liable to pay toll. That only which is within the exception is exempted. That the mail is in no sense the property of the United States, and was not so understood by the parties to the compact, has already been shown. It follows, therefore, that a law of Pennsylvania, imposing on such stage a half or full rate of toll, is no violation of the compact.
But, if the mail-stage were placed on a footing with a wagon or carriage laden with the property of the United States, is the act of 1836, requiring it to pay toll, a violation of the compact? I think it is not. A wagon or carriage laden with the property of the United States, means a wagon or carriage having, as before remarked, a full or usual load. Such a vehicle is exempted from toll by the act of 1831. But suppose such wagon or carriage should have half its load of the property of the United States, and the other half of the property of individuals, for which the ordinary price for transportation was paid; is such a wagon, thus laden, exempted from toll? Surely it is not. An exemption under such circumstances would be a fraud upon the compact. It should be required to pay half-toll, and this is what the law of Pennsylvania requires. The mail-stage by that law is only half-toll, when it conveys passengers with the mail. There is, then, no legal objection to the exaction of this toll. It is in every point of view just, and within the spirit of the compact.
In the argument for the United States, the broad ground was assumed, that no state had the power to impose a toll on a stage used for the transportation of the mail. That it is a means of the federal government to carry into effect its constitutional powers, and, consequently, is not a subject of state taxation. To sustain this position the cases of McCulloch v. The State of Maryland, 4 Wheaton, 316, and Dobbins v. The Commissioners of Erie County, 16 Peters, 435, were cited.
In the first case, this court held, "that a state government had no *179 right to tax any of the constitutional means employed by the government of the union, to execute its constitutional powers." And the Bank of the United States was held to be a means of the government. In the second case, under a general law of Pennsylvania imposing a tax on all officers, a tax was assessed on the office held by the plaintiff, as captain of a revenue-cutter of the United States, and this court held that such law, so far as it affected such an officer, was unconstitutional and void. The court say, "there is a concurrent right of legislation in the states and the United States, except as both are restrained by the Constitution of the United States. Both are restrained by express prohibitions in the Constitution; and the states by such as are reciprocally implied when the exercise of a right by a state conflicts with the perfect execution of another sovereign power delegated to the United States. That occurs when taxation by a state acts upon the instruments and emoluments and persons which the United States may use and employ as necessary and proper means to execute their sovereign power."
Neither of these cases reach or affect the principle involved in the case under consideration. The officer of the United States was considered as a means or instrument of the government, and, therefore, could not be taxed by the state as an officer. To make that case the same in principle as the one before us, the officer must claim exemption from toll as a means of the government, in passing over a toll-bridge or turnpike-road constructed by a state, or by an association of individuals, under a state law. The principle of the other case is equally inapplicable. Maryland taxed the franchise of the Bank of the United States, and if the law establishing that bank were constitutional, the franchise was no more liable to taxation by a state than rights and privileges conferred on one or more individuals, under any law of the union. With the same propriety a judge of the United States might be subjected to a tax by a state for the exercise of his judicial functions. And so of every other officer and public agent. But the court held that the stock in the bank owned by a citizen might be taxed.
A toll exacted for the passage over a bridge or on a turnpike-road is not, strictly speaking, a tax. It is a compensation for a benefit conferred. Money has been expended in the construction of the road or bridge, which adds greatly to the comforts and facilities of travelling, and on this ground compensation is demanded. Now, can the United States claim the right to use such road or bridge free from toll? Can they place locomotives on the rail-roads of the states or of companies, and use them by virtue of their sovereignty? Such acts would appropriate private property for public purposes, without compensation; and this the Constitution of the union prohibits.
It is said, in the argument, that as well might a revenue-cutter be taxed by a state as to impose a toll on the stage which conveys the mail. The revenue-cutter plies on the thoroughfare of nations or of *180 the state, which is open to all vessels. But the stage passes over an artificial structure of great expense, which is only common to all who pay for its use a reasonable compensation. There can be no difficulty on this point. At no time, it is believed, has the Post-office Department asserted the right to use the turnpike-roads of a state, in the transmission of the mail, free from toll.
Pennsylvania stands pledged to keep the road in repair, by the use of the means stipulated in the compact. And she has bound herself, "that no change, alteration, or amendment shall ever be adopted that will in any wise defeat or affect the true intent and meaning of the act of 1831." In my judgment, that state has in no respect violated the compact by the act of 1836. If the mail-stage can be included in the exemption by the terms, "wagon or carriage laden with the property of the United States," still the half-toll on such stage, when it contains passengers, is within the compact. But, as has been shown, the mail-stage is not included in the exemption, and, consequently, it was liable to be charged with full toll. The state, therefore, instead of exceeding its powers under the compact, has not yet exercised them to the extent which the act of 1831 authorizes.
Mr. Justice DANIEL.
With the profoundest respect for the opinions of my brethren, I find myself constrained openly to differ from the decision which, on behalf of the majority of the court, has just been pronounced. This case, although in form a contest between individuals, is in truth a question between the government of the United States and the government of Pennsylvania. It is, to a certain extent, a question of power between those two governments; and, indeed, so far as it is represented to be a question of compact, the very consideration on which the interests of the federal government are urged involves implications affecting mediately or directly what are held to be great and fundamental principles in our state and federal systems. It brings necessarily into view the operation and effect of the compact insisted upon as controlled and limited by the powers of both the contracting parties. In order to show more plainly the bearing of the principles above mentioned upon the case before us, they will here be more explicitly, though cursorily, referred to.
I hold, then, that neither Congress nor the federal government in the exercise of all or any of its powers or attributes possesses the power to construct roads, nor any other description of what have been called internal improvements, within the limits of the states. That the territory and soil of the several states appertain to them by title paramount to the Constitution, and cannot be taken, save with the exceptions of those portions thereof which might be ceded for the seat of the federal government and for sites permitted to be purchased for forts, arsenals, dock-yards, &c., &c. That the power of *181 the federal government to acquire, and that of the states to cede to that government portions of their territory, are by the Constitution limited to the instances above adverted to, and that these powers can neither be enlarged nor modified but in virtue of some new faculty to be imparted by amendments of the Constitution. I believe that the authority vested in Congress by the Constitution to establish post-roads, confers no right to open new roads, but implies nothing beyond a discretion in the government in the regulations it may make for the Post-office Department for the selection amongst various routes, whilst they continue in existence, of those along which it may deem it most judicious to have the mails transported. I do not believe that this power given to Congress expresses or implies any thing peculiar in relation to the means or modes of transporting the public mail, or refers to any supposed means or modes of transportation beyond the usual manner existing and practised in the country, and certainly it cannot be understood to destroy or in any wise to affect the proprietary rights belonging to individuals or companies vested in those roads. It guaranties to the government the right to avail itself of the facilities offered by those roads for the purposes of transportation, but imparts to it no exclusive rights  it puts the government upon the footing of others who would avail themselves of the same facilities.
In accordance with the principles above stated, and which with me are fundamental, I am unable to perceive how the federal government could acquire any power over the Cumberland road by making appropriations, or by expending money to any amount for its construction or repair, though these appropriations and expenditures may have been made with the assent, and even with the solicitation of Pennsylvania. Neither the federal government separately, nor conjointly with the state of Pennsylvania, could have power to repeal the Constitution. Arguments drawn from convenience or inconvenience can have no force with me in questions of constitutional power; indeed, they cannot be admitted at all, for if once admitted, they sweep away every barrier erected by the Constitution against implied authority, and may cover every project which the human mind may conceive. It matters not, then, what or how great the advantage which the government of the United States may have proposed to itself or to others in undertaking this road; such purposes or objects could legitimate no acts either expressly forbidden or not plainly authorized. If the mere appropriation or disbursement of money can create rights in the government, they may extend this principle indefinitely, and with the very worst tendencies  those tendencies would be the temptation to prodigality in the government and a dangerous influence with respect to others.
In my view, then, the federal government could erect no toll-gates nor make any exaction of tolls upon this road; nor could that government, in consideration of what it had done or contributed, *182 constitutionally and legally demand of the state of Pennsylvania the regulation of tolls either as to the imposition of particular rates or the exemption of any species of transportation upon it. As a matter of constitutional and legal power and authority, this appertained to the state of Pennsylvania exclusively. Independently, then, of any stipulations with respect to them, vehicles of the United States, or vehicles transporting the property of the United States, and that property itself, would, in passing over this road, be in the same situation precisely with vehicles and property appertaining to all other persons; they would be subject to the tolls regularly imposed by law. There can be no doubt if the road were vested in a company or in a state, that either the company or the state might stipulate for any rate of toll within the maximum of their power, or might consent to an entire exemption; and such stipulation, if made for a valuable or a legal consideration, would be binding.
The United States may contract with companies or with communities for the transportation of their mails, or any of their property, as well as with carriers of a different description; and consequently could contract with the state of Pennsylvania. But what is meant to be insisted on here is, that the government could legally claim no power to collect tolls, no exemption from tolls, nor any diminution of tolls in their favour, purely in consequence of their having expended money on the road, and without the recognition by Pennsylvania of that expenditure as a condition in any contract they might make with that state. Without such recognition, the federal government must occupy the same position with other travellers or carriers, and remain subject to every regulation of her road laws which the state could legally impose on others.
This brings us to an examination of the statutes of Pennsylvania, and to an inquiry into any stipulations which the state is said to have made with the federal government, as declared in those statutes. That examination will, however, be premised by some observations, which seem to be called for on this occasion. These acts of the Pennsylvania legislature have been compared with the acts of other legislative bodies relative to this road, and it has been supposed that the Pennsylvania laws should be interpreted in conjunction with those other state laws, and farther, that all these separate state enactments should be taken, together with the acts of Congress passed as to them respectively, as forming one, or as parts of one entire compact with the federal government. I cannot concur in such a view of this case. On the contrary, I must consider each of the states that have legislated in respect to this road, as competent to speak for herself; as speaking in reference to her own interests and policy, and independently of all others; and unshackled by the proceedings of any others. By this rule of construction let us examine the statutes of Pennsylvania. The act of April 4th, 1831, which may be called the compact law as it contains all that Pennsylvania professed to undertake, *183 begins by stating the doubts which were entertained upon the authority of the United States to erect toll-gates and to collect tolls on the Cumberland road; doubts which, with the government as well as with others, seem to have ripened into certainties, inasmuch as, notwithstanding its large expenditures upon this road, the government had never exacted tolls for travelling or for transportation upon it. The statute goes on next to provide, that if the government of the United States will make such farther expenditures as shall put the road lying within the limits of Pennsylvania in complete repair, Pennsylvania will erect toll-gates and collect tolls upon the road, to be applied to the repairs and preservation of it. The same act invests the commissioners it appoints to superintend the road, with power to increase or diminish the tolls to be levied; limiting the increase by the rates which the state had authorized upon an artificial road that she had established from the Susquehanna, opposite the borough of Harrisburg, to Pittsburgh. Then in the act of 1831 are enumerated the subjects of toll, and the rates prescribed as to each of those subjects. Amongst the former are mentioned chariots, coaches, coachees, stages, wagons, phaetons, chaises. In the 3d proviso to the 2d section it is declared, "that no toll shall be received or collected for the passage of any wagon or carriage laden with the property of the United States, or any cannon or military stores belonging to the United States, or to any of the states belonging to this union." On the 13th of June, 1836, was passed by the legislature of Pennsylvania, "An act relating to the tolls on that part of the Cumberland road which passes through Pennsylvania." The 1st section of this act is in the following words: "All wagons, carriages, or other modes of conveyance, passing upon that part of the Cumberland road which passes through Pennsylvania, carrying goods, cannon, or military stores, belonging to the United States, or to any individual state of the union, which are excepted from the payment of toll by the second section of an act passed the fourth of April, anno Domini eighteen hundred and thirty-one, shall extend only so far as to relieve such wagons, carriages, and other modes of conveyance, from the payment of toll to the proportional amount of such goods so carried, belonging to the United States, or to any of the individual states of the union; and that in all cases of wagons, carriages, stages, or other modes of conveyance, carrying the United States mail, with passengers or goods, such wagon, stage, or other mode of conveyance, shall pay half-toll upon such modes of conveyance."
Upon the construction to be given to the 1st and 2d sections of the statute of 1831, and to the 1st section of the statute of 1836, depends the decision of the case before us. By the defendant in error it is insisted that, by the sections of the act of 1831 above cited, stages or stage-coaches, transporting the mail of the United States, are wholly exempted by compact from the payment of tolls, although the mails may constitute but a small portion of their lading; and *184 those vehicles may be at the same time freighted for the exclusive profit of the mail contractors, with any number of passengers, or with any quantity of baggage or goods, which can be transported in them, consistently with the transportation of the mail; and that the 1st section of the act of 1836, which declares that "in all cases of wagons, carriages, stages, or other modes of conveyance, carrying the United States mail, with passengers or goods, such wagon, stage, or other mode of conveyance, shall pay half-toll upon such mode of conveyance," is a violation of the compact. Let us pause here, and inquire what was the natural and probable purpose of the exemption contained in the act of 1831? Was that exemption designed as a privilege or facility to the government, or as a donation for private and individual advantage? Common sense would seem to dictate the reply, that the former only was intended by the law; and even if the privilege or facility to the government could be best secured by associating it with individual profit, certainly that privilege or facility could, on no principle of reason or fairness, be so sunk, so lost sight of, so entirely perverted, as to make it a mean chiefly of imposition and gain on the part of individuals, and the cause of positive and serious public detriment; and such must be the result of the practice contended for by the defendants in error, as it would tend to impede the celerity of transportation, and to destroy the road itself, by withholding the natural and proper fund for its maintenance. Passing then from what is believed to be the natural design of these enactments, let their terms and language be considered. By those of the 2d section of the law of 1831, every stage or wagon is made expressly liable to toll, without regard to the subjects it might transport, and without regard to the ownership of the vehicle itself. The terms of the law are universal; they comprehend all stages and all wagons; they would necessarily, therefore, embrace stages and wagons of the United States, or the like vehicles of others carrying the property of the United States or of private persons. If, then, either the vehicles of the United States, or of others carrying the property of the United States, have been withdrawn from the operation of the act of 1831, this can have been done only by force of the 3d proviso of the 2d section of that act. The proviso referred to declares that no toll shall "be collected for the passage of any wagon or carriage laden with the property of the United States," &c., &c. Can this proviso be understood as exempting stages, whether belonging to the government or to individuals, which were intended purposely to carry the MAIL? It is not deemed necessary, in interpreting this proviso, to discuss the question, whether the United States have a property in mails which they carry. It may be admitted that the United States and all their contractors have in the mails that property which vests by law in all common carriers; it may be admitted that the United States have an interest in the mails even beyond this. These admissions do not vary the real inquiry here, *185 which is, whether by this proviso the mails of the United States, or the carriages transporting them, were intended to be exempted from tolls? This law, like every other instrument, should be interpreted according to the common and received acceptation of its words; and artificial or technical significations of words or phrases should not be resorted to, except when unavoidable, to give a sensible meaning to the instrument interpreted; or when they may be considered as coming obviously within the understanding and contemplation of the parties. According to this rule of interpretation, what would be commonly understood by "the property of the United States," or by the phrase "wagons and carriages laden with the property of the United States?" Would common intendment apply those terms to the mail of the United States, or to vehicles carrying that mail? The term "mail" is perhaps universally comprehended as being that over which the government has the management for the purposes of conveyance and distribution; and it would strike the common understanding as something singular, to be told that the money or letters belonging to the citizen, and for the transportation of which he pays, was not his property, but was the property of the United States. The term "mail," then, having a meaning clearly defined and universally understood, it is conclusive to my mind, that in a provision designed to exempt that mail, or the vehicle for its transportation, the general and equivocal term "property" would not have been selected, but the terms "mail," and "stages carrying the mail"  terms familiar to all  would have been expressly introduced.
Farther illustration of the language and objects of the legislature of Pennsylvania may be derived from the circumstance, that, in the law of 1831, they couple the phrase "property of the United States" with "property of the states." The same language is used in reference to both; they are both comprised in the same sentence; the same exemption is extended to both. Now the states have no mails to be transported. It then can by no means follow, either by necessary or even plausible interpretation, that by "property of the United States" was meant the "mails of the United States," any more than by "property of the states" was meant the "mails" of those states; on the contrary, it seems far more reasonable that the legislature designed to make no distinction with regard to either, but intended that the term "property" should have the same signification in reference both to the state and federal governments.
In the acceptation of the term "property," insisted on for the defendants in error, the mails committed to the contractor are the property of that contractor also. Yet it would hardly have been contended that in a provision for exempting the "property" of a mail contractor from tolls, either a vehicle belonging to the United States, and in the use of such a contractor, or the mail which he carried in it, would be so considered as his property as to bring them within that exemption; yet such is the conclusion to which the interpretation contended *186 for by the defendants would inevitably lead. That construction I deem to be forced and artificial, and not the legitimate interpretation of the statute, especially when I consider that there are various other subjects of property belonging to the United States, and belonging to them absolutely and exclusively, which from their variety could not well be specifically enumerated, and which, at some period or other, it might become convenient to the government and beneficial to the country to transport upon this road. But if, by any interpretation, the words "wagon or carriage laden with the property of the United States," can be made to embrace stages carrying the mail, and employed purposely for that service, they surely cannot, by the most forced construction, be made to embrace stages laden with every thing else, by comparison, except the mail of the United States, and in which the mail was a mere pretext for the transportation of passengers and merchandise, or property of every description and to any amount, free of toll. They must at all events be laden with the mail. The term laden cannot be taken here as a mere expletive, nor should it be wrested from its natural import  be made identical in signification with the terms "carrying" or "transporting." Such a departure would again be a violation of common intendment, and should not be resorted to; and the abuses just shown, which such a departure would let in and protect, furnish another and most cogent reason why the common acceptation of the phrase, "property of the United States," should be adhered to. Fairness and equality with respect to all carriers and travellers upon this road, and justice to the state which has undertaken to keep it in repair from the tolls collectable upon it, require this adherence.
If the interpretation here given of the act of 1831 be correct, then admitting that act to be a compact between Pennsylvania and the United States, the former has, by the 1st section of the act of 1836, infracted no stipulation in that compact. Pennsylvania never did, according to my understanding of her law of 1831, agree to the exemption from tolls for stages, wagons, or vehicles of any kind, intended for carrying the mails of the United States. These stood upon the like footing with other carriages. If this be true, then by the act of 1836, in which she has subjected to half-tolls only, stages, wagons, &c., carrying the mails, and at the same time transporting passengers or goods, so far from violating her compact, or inflicting a wrong upon the government or upon mail contractors, that state has extended to them a privilege and an advantage which, under the 3d proviso of the act of 1831, they did not possess. My opinion is, that the plaintiff in the court below had an undoubted right of recovery.